953 S.W.2d 489 (1997)
VIREO, P.L.L.C.; Chaetura, P.L.L.C.; William Franklin, M.D., P.A.; Don Connell, M.D.; and William Franklin, M.D., Appellants,
v.
Danny CATES; CD Testing, Inc.; and Eagle Medical Management, Inc., Appellees.
No. 03-96-00303-CV.
Court of Appeals of Texas, Austin.
September 11, 1997.
Rehearing Overruled October 30, 1997.
Penny Hobbs, McGinnis, Lochridge & Kilgore, L.L.P., Austin, for Appellants.
*490 Bruce R. Hardesty, Gray & Becker, P.C., Austin, for Appellees.
Before POWERS, ABOUSSIE and JONES, JJ.
POWERS, Justice.
Plaintiffs appeal from a trial-court order overruling their motion to compel arbitration of defendants' counterclaims.[1] We will affirm the order.

THE CONTROVERSY
The plaintiffs own and operate medical centers. They entered into contracts ("Management Agreements") with Eagle Medical Management, Inc., in which Eagle undertook for compensation to administer and manage the non-medical operations of the centers. Defendant Danny Cates executed the Management Agreements for Eagle as its "chief executive officer," agreeing therein that its provisions would bind him as an Eagle officer. Defendant CD Testing, Inc., was not a party to the Management Agreements; plaintiffs alleged Cates was "president" of CD Testing, Inc.
In Paragraph Nine of the Management Agreements, the parties contracted that "no civil action concerning any dispute under this Agreement shall be instituted before any court, and all such disputes shall be submitted to final and binding arbitration before a single arbitrator" who shall decide the dispute under the laws of the State of Texas and the Rules of the American Arbitration Association (emphasis added). The provision excluded from its scope applications to a court for equitable relief.[2]
A dispute arose between the parties. The plaintiffs canceled the Management Agreements unilaterally; the defendants contended the termination was wrongful. The parties attempted without success to resolve the dispute but neither initiated arbitration proceedings as required by Paragraph Nine of the Management Agreements. The plaintiffs sued the defendants in district court on causes of action for money damages; the defendants counterclaimed by causes of action for declaratory relief and money damages for wrongful termination of the Management Agreements.
The plaintiffs moved the trial court to abate defendants' counterclaims and compel their arbitration as required by Paragraph Nine. The trial judge overruled the plaintiffs' motion, finding from the record that plaintiffs had abandoned as a matter of law their right under Paragraph Nine to compel arbitration. The plaintiffs appeal to this Court on four points of error: (1) the plaintiffs, as a matter of law, did not abandon their right to compel arbitration of defendants' counterclaims; (2) the trial-court order is clearly erroneous; (3) the "evidence" is legally and factually insufficient to support a finding that plaintiffs waived or abandoned their right to compel arbitration;[3] and (4) the trial judge abused his discretion in overruling the plaintiffs' motion to compel arbitration.[4] We hold the trial judge did not abuse his discretion, the ultimate issue raised by the points of error.

*491 JUDICIAL ENFORCEMENT OF ARBITRATION AGREEMENTS
The trial-court proceeding was a statutory proceeding governed by section 171.002(a) of the Texas Civil Practice and Remedies Code. The statute directs a trial judge to "order the parties to proceed with arbitration" when a party applies for such relief and shows "the opposing party's refusal to arbitrate." Tex. Civ. Prac. & Rem.Code Ann. § 171.002(a) (West Supp.1997). When "the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party; otherwise the application shall be denied." Id. (emphasis added). In Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 268-69 (Tex.1992), the supreme court explained these statutory provisions. They contemplate "summary proceedings" akin to those applicable in deciding motions for summary judgmentthe trial judge must decide "whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations." Unlike summary judgment proceedings, however, "if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts." Anglin, 842 S.W.2d at 268-69 (emphasis added).
In the present case, neither party introduced evidence at the hearing. No affidavits, discovery documents, or stipulations were in the record; the record before the court contained only the parties' respective pleadings.[5] The pleadings established the following agreed facts: the parties were in dispute concerning defendants' performance under the Management Agreements; neither initiated the arbitration proceedings expressly required by Paragraph Nine before resorting to causes of action seeking a judicial remedy in money damages, although each claimed to be an aggrieved party in the dispute; and in bringing their respective claims in district court, neither requested specific performance of the arbitration provision forbidding any "civil action concerning any dispute under this Agreement," as stated in Paragraph Nine. Assuming for the moment that plaintiffs' claims against defendants concerned[6] a "dispute under" the Management Agreements (which plaintiffs deny) what consequences does the law assign to those undisputed facts?
A plaintiff who sues on an arbitrable claim unconditionally, without having initiated arbitration of the claim or demanding specific performance of the arbitration agreement, creates in the defendant a right of electionthe defendant may insist or not upon arbitration, as he chooses. If the defendant does not insist upon arbitration, the contracting parties have mutually repudiated the arbitration covenant as a matter of law and waived any right thereunder. 6 C.J.S. Arbitration § 37 at 226 (1975); 4 Am.Jur.2d Alternate Dispute Resolution § 130 at 170 (1995); R.P. Davis, Waiver of Arbitration Provision in Contract, 161 A.L.R. 1426, 1428-34 (1946).[7]See, e.g., Mendoza v. Canizales, *492 695 S.W.2d 266, 271 (Tex.App.San Antonio 1985, no writ); Premier Petroleum Co. v. Box, 255 S.W.2d 298, 301 (Tex.Civ. App.Eastland), writ ref'd n.r.e., 152 Tex. 321, 257 S.W.2d 105 (1953).
It is undisputed here that defendants have elected not to arbitrate. They possessed a right of election, however, only if the plaintiffs' claims against them concerned a "dispute under" the Management Agreements or were so "factually intertwined" with those agreements as to invoke the judicial policy favoring a joint resolution of multiple claims and the avoidance of multiple determinations of the same matters. See Anglin, 842 S.W.2d at 271. We turn then to that question of law, determinable from the parties' respective pleadings.

CONSTRUCTION OF THE PLEADINGS
We believe it desirable to set out verbatim the material parts of the plaintiffs' petition. These allege as follows:
6. On or about May 1995, Defendant Cates began acting as agent for the medical centers for certain matters. On or about July, 1995, that agency relationship was formalized by the signing of three Management Service Agreements between Eagle and the respective medical centers ("Management Agreements")....
7. Prior to entering into the Management Agreements, Cates represented to the physicians that he had the expertise to manage the medical centers.
8. In addition to assuming management responsibilities, Eagle, its officers, directors and shareholders agree not to compete with the medical centers in Travis, Hays and Williamson Counties during the term of the Management Agreements and for a period of twelve months after the Management Agreement [sic] was terminated for any reason.
9. While acting as the agent for the medical centers, Cates entered into agreements with Southwestern Bell telephone ... to provide telephone services to Vireo and Chaetura.... Rather than entering into the SWBT Agreements under the principles' names, Cates entered into the SWBT Agreements under the name of Dan Cates d/b/a CD Testing, Inc. The phone numbers for the SWBT Agreements are listed in the SWBT directory under Southwest Medical Center for the use of the medical centers' patients.
10. On or about November 1995, the medical centers terminated the Management Agreements with Eagle.
11. After the Management Agreements were terminated, on information and belief, the medical centers became aware that Cates had continued to operate CD Testing during the term of the Management Agreements in direct competition with the medical centers and that after the contract was terminated, Cates actively recruited business from the clients of the medical centers and has represented to the medical centers' clients that the medical centers have or are about to go out of business.
12. After the Management Agreements were terminated, Cates claimed that the Management Agreements were wrongfully terminated. The Management Agreements provide for arbitration *493 of disputes. The parties attempted informal settlement, but on or about February 8, 1996, the Plaintiffs notified Cates and Eagle that settlement was unrealistic and that the parties would need to arbitrate the matter.
13. On or about February 8, 1996, without any warning, Cates had the telephone company disconnect the telephone services to Vireo and Chaetura for the numbers listed in Exhibit B attached hereto.
14. In addition to the huge volume of telephone calls that the medical centers receive from their patients for routine and emergency matters, this is asthma season and many of the medical centers' patients suffer from asthma and need to contact the medical centers for emergencies.
Upon the foregoing factual allegations, plaintiffs founded two causes of action described as follows:
Tortious Interference with Contracts and Business Relationships.
15. The [defendants'] conduct constitutes a wrongful or malicious interference with the [plaintiffs'] performance or the formation of the contracts or the right to pursue a lawful business calling, trade, or occupation for which damages may be recovered.

Breach of Fiduciary Duty.
16. Cates' conduct prior to execution of the Management Agreements constitutes breach of fiduciary duty in that Cates failed to exercise reasonable care and diligence in to [sic] the medical centers in the performance of his duties, he breached his duty to obey, he breached his duty to give information, and he breached his duty of loyalty.
(emphasis added).
Plaintiffs attached to their petition and incorporated therein copies of the Management Agreements. Their allegations may be summarized as follows: (1) before making the Management Agreements Cates obtained telephone service for the medical centers in his own name and represented he had the expertise to manage the medical centers; (2) plaintiffs terminated the Management Agreements in November 1995 and learned thereafter that Cates, while the agreements were in force, had operated CD Testing, Inc., in direct competition with the medical centers;[8] (3) Cates continued to do so, after plaintiffs terminated the Management Agreements, by recruiting medical-center clients and representing that the centers had or were about to go out of business; and (4) Cates caused termination of telephone service to the medical centers without warning. These allegations are the entire sum and substance of what plaintiffs mean by their causes of action for "tortious interference" and "breach of fiduciary duty."
As might be expected, defendants' counterclaims against plaintiffsclaims the plaintiffs moved to assign to binding arbitrationalleged a different view of the material transactions. In their first amended original answer, defendants requested compensatory damages, punitive damages, and declaratory and injunctive relief on allegations that may be summarized as follows: (1) plaintiffs terminated the Management Agreements November 9, 1995, assertedly for cause but in truth to deprive Eagle and Cates of certain financial benefits they were entitled to receive under the Management Agreements if they were terminated without cause; (2) Eagle and Cates substantially performed their obligations under the Management Agreements, *494 precluding their termination for cause; (3) even assuming plaintiffs had a right to terminate for cause, however, they failed to give Eagle and Cates thirty-days previous notice and an opportunity to cure any deficient performance as expressly required by the Management Agreements; (4) plaintiffs' conduct constituted a prior breach of the Management Agreements and their fiduciary duties, entitling defendants to compensatory damages; (5) the noncompetition provision in the Management Agreements prohibited Eagle and Cates from providing management services to others whom plaintiffs reasonably believed were in competition with plaintiffs' medical centers, but the noncompetition provision did not prohibit the drug-testing services actually provided by CD Testing, Inc., and defendants requested declaratory relief accordingly; (6) defendants were entitled to money damages for sums expended in reliance upon false representations made by plaintiffs in inducing defendants to enter into the Management Agreements; and (7) defendants were entitled to recover from plaintiffs compensatory and punitive damages for their defamatory statement to third persons that plaintiffs had terminated the Management Agreements because they discovered that Cates had embezzled money from the medical centers.
Plaintiffs' petition avers no basis, apart from the non-competition agreement or another duty expressed or implied in the Management Agreements, for imposing upon the defendants a duty not to compete with the medial centers for patients and a duty to maintain the telephone service that Cates had taken out in his own name before execution of those agreements. One defendant CD Testing, Inc.was not a party to the Management Agreements and its corporate autonomy is unassailed in the record. No basis appears in the plaintiffs' allegations for a contention that CD was prohibited to compete for patients or that CD is otherwise liable for the damages claimed by plaintiffs.
Nor does the petition allege that any of Cates' representations were false and no basis is apparent for a theory that any of them were actionable per se. The sole factual allegation pertaining to the period of time "prior to execution of the Management Agreements" was the plaintiffs' allegation that "Cates represented to the" plaintiffs before entering into the Management Agreements "that he had the expertise to manage the medical centers." This representation was expressly repeated in the Management Agreements. The petition, moreover, suggests no basis for holding CD Testing, Inc., liable for Cates' alleged breaches of fiduciary duty, which would appear to be personal to him especially "prior to the execution of the Management Agreements."
We believe plaintiffs' causes of action either concern (relate to) a dispute under the Management Agreements or those causes of action are "factually intertwined" with those agreements sufficiently to invoke the judicial policy favoring a joint resolution of claims and the avoidance of multiple determinations of the same matters. Anglin, 842 S.W.2d at 271. Suppose, for example, that an arbitrator construes the noncompetition provision as defendants contend it should be construed, resulting in a determination that the provision did not prohibit CD's drug-testing services; and a district court construes the provision to the contrary. Or suppose the arbitrator determines plaintiffs first breached the Management Agreements by terminating them without the requisite notice, thereby entitling defendants to damages and cancelling the noncompetition provision, among other contract obligations; but the district court finds to the contrary. See Custom Drapery Co. v. Hardwick, 531 S.W.2d 160, 165-66 (Tex.Civ.App.Houston [1st Dist.] 1975, no writ) (former employer precluded from enforcing noncompetition covenant where he, not employee, caused breach of contract). The possibility of contradictory determinations in the two forums is obvious. The relation of plaintiffs' causes of action to the Management Agreements is obvious. We hold accordingly and affirm the trial-court order.
JONES, Justice, dissenting.
The central issue in this case is whether a party waives its right to arbitration when it files suit in court to resolve disputes that are not subject to the parties' arbitration agreement. *495 The majority answers the question "yes." Because the majority misapplies well-established precedent regarding the waiver of a contractual right to arbitration, I respectfully dissent.

FACTUAL AND PROCEDURAL BACKGROUND
The majority's statement of the factual and procedural background is essentially correct. Because the trial court's order denying plaintiffs' motion to compel arbitration was rendered before any discovery was conducted or evidentiary hearings were held, the factual background to the three causes of action alleged by plaintiffs is taken primarily from the allegations found in paragraphs 6 through 14 of plaintiffs' original petition. In May 1995, Cates began acting as an agent for the medical centers for certain matters. The agency relationships were formalized on August 1, 1995, when Vireo and Franklin each executed a management service agreement with Eagle Medical. On November 1, 1995, Chaetura executed a similar management service agreement with Eagle Medical. Cates is the president and sole shareholder of Eagle Medical. CD Testing was not a party to any of the agreements.
By these agreements, Eagle Medical agreed to operate and manage the administrative and non-medical aspects of plaintiffs' practices and clinics. Each management agreement included an arbitration clause by which plaintiffs and Eagle Medical mutually agreed that:
Except as provided below, no civil action concerning any dispute under this Agreement shall be instituted before any court, and all such disputes shall be submitted to final and binding arbitration.... [T]he laws of the State of Texas shall govern, and the arbitrator solely shall apply them to, the interpretation and construction of this Agreement.... Notwithstanding the foregoing, either party shall have the right, at its sole discretion, to seek equitable relief from a court of competent jurisdiction, without being limited in recourse to arbitration, ... which equitable relief shall include (but not be limited to) the entering of a temporary restraining order and/or a preliminary injunction.
(Emphasis added.) In another paragraph of each agreement, Eagle Medical agreed not to compete with the medical centers in Travis, Hays, and Williamson Counties during the terms of the management agreements and for a period of twelve months after the agreements were terminated for any reason.
While acting as the agent for the medical centers, Cates entered into agreements with Southwestern Bell Telephone to provide telephone service to Vireo and Chaetura. Without the principals' authorization, Cates entered the Bell agreements under the name of Dan Cates d/b/a CD Testing, Inc. instead of under the principals' names. The telephone numbers were listed in the Bell directory under Southwest Medical Center for the use of the medical centers' patients.
On or about November 9, 1995, plaintiffs terminated each of the management agreements due to Eagle Medical's alleged failure to perform its duties and obligations under the agreements. After the management agreements were terminated, the medical centers became aware that Cates had operated CD Testing during the terms of the agreements in direct competition with the medical centers. Plaintiffs also learned that, after the agreements were terminated, Cates actively recruited business from the clients of the medical centers and represented to the clients that the medical centers had gone or were about to go out of business.
Cates claimed that the management agreements were wrongfully terminated. The parties attempted settlement informally. On or about February 8, 1996, plaintiffs notified Cates and Eagle Medical that settlement was unrealistic and that the parties would need to arbitrate. Also on February 8, plaintiffs discovered that, without giving them notice, Cates had the telephone company disconnect services to Vireo and Chaetura for some of the centers' telephone lines. In addition to the huge volume of telephone calls the medical centers routinely receive from their patients, many of the medical centers' patients suffer from asthma and, because it was asthma season, needed to contact the medical centers for emergencies.
*496 On February 9, plaintiffs filed this lawsuit seeking temporary and permanent injunctions to prevent Cates, Eagle Medical, and/or CD Testing from competing with plaintiffs in violation of the covenant not to compete contained in the management agreements. Additionally, plaintiffs asserted causes of action seeking damages for (1) tortious interference with contracts and business relationships and (2) breach of fiduciary duty. Also on February 9, plaintiffs sought and the trial court granted a temporary restraining order to keep defendants from interfering with or disconnecting telephone service to the medical centers. The parties later agreed to the entry of an order for a temporary injunction. On February 26, defendants filed their original answer and counterclaims. Defendants' counterclaim asserted wrongful termination of the agreements and sought damages, a declaratory judgment, injunctive relief, and attorney's fees. On March 18, plaintiffs answered and filed a motion seeking to compel arbitration of defendants' counterclaims; the motion also sought to abate the related trial proceedings pending arbitration. Defendants did not file a response to the motion.
After a hearing at which no evidence was adduced, the trial court denied plaintiffs' motion to compel arbitration. The court concluded that, by initiating the lawsuit, plaintiffs had waived their right to seek arbitration of disputes under the management agreements, including defendants' counterclaims. Plaintiffs filed this interlocutory appeal complaining of the trial court's denial of their motion to refer defendants' counterclaims to arbitration.

DENIAL OF MOTION TO COMPEL ARBITRATION
In four points of error, plaintiffs contend the trial court erred by denying their motion to refer defendants' counterclaims to arbitration. Plaintiffs argue they did not formally seek arbitration before filing suit because their own causes of action pertained to events that occurred outside the scope of the management agreements. Defendants answered without raising arbitration as an affirmative defense or otherwise requesting that plaintiffs' claims be arbitrated. Defendants asserted various counterclaims against plaintiffs, to which plaintiffs answered and filed a motion to refer only defendants' counterclaims to arbitration. At the hearing on plaintiffs' motion, defendants' sole contention was that plaintiffs had waived the right to seek arbitration by filing their own lawsuit without first seeking arbitration of the claims asserted. Plaintiffs contend that, as a matter of law, they did not waive their right to arbitration. The majority concludes the parties mutually repudiated the arbitration agreement. I respectfully disagree. Neither party has repudiated the arbitration agreement. Furthermore, the plaintiffs have not waived their right to arbitration because the defendants failed to establish prejudice and failed to establish that the plaintiffs' claims fall within the scope of the arbitration agreement.

1. Repudiation of the Arbitration Agreement
In the present case, plaintiffs sued and defendants answered and counterclaimed. Rather than defendants seeking arbitration, as in the usual case, here plaintiffs sought arbitration of defendants' counterclaims, asserting that their own causes of action were not within the scope of the management agreement while the defendants' causes of action were within the agreements. I will assume that the majority is correct in its proposition that a party who sues in court on an arbitrable claim, without having initiated arbitration, creates a "right of election" in the opposing party to repudiate the arbitration agreement. However, the rule does not apply in the present case because repudiation of arbitration agreements must be clear and unequivocal. L.H. Lacy Co. v. City of Lubbock, 559 S.W.2d 348, 352 (Tex.1977). A party cannot be said to have unequivocally repudiated its right to arbitration when it asserts claims it reasonably believes are outside the scope of any arbitration agreement. Because the claims asserted by plaintiffs in the present case are at least arguably outside the scope of the arbitration clause, plaintiffs cannot be said to have unequivocally repudiated their right to arbitrate.
*497 Furthermore, the cases on which the majority relies refer to the common-law proposition that either party to an executory agreement providing for arbitration of future disputes is allowed to revoke the agreement at any time before the arbitration proceeding resulted in an award. See Mendoza v. Canizales, 695 S.W.2d 266, 271 (Tex.App.San Antonio 1985, no writ). This rule is derived from the common law, where courts have refused to enforce agreements to arbitrate specific disputes. See L.H. Lacy Co., 559 S.W.2d at 352. The purpose of the Texas General Arbitration Act ("TGAA"), which governs the present arbitration clause,[1] was to abrogate this common-law proposition. See Tex. Civ. Prac. & Rem.Code. Ann. § 171.021(a) (West 1997). Moreover, application of the proposition has been criticized even by courts interpreting common-law arbitration agreements. See, e.g., L.H. Lacy Co., 559 S.W.2d at 352; Wylie Indep. Sch. Dist. v. TMC Foundations, Inc., 770 S.W.2d 19, 21-22 (Tex.App.Dallas 1989, writ dism'd); Olshan Demolishing Co. v. Angleton Indep. Sch. Dist., 684 S.W.2d 179, 184 (Tex.App.Houston [14th Dist.] 1984, writ ref'd n.r.e.). The other support relied on by the majority for its proposition that the parties mutually repudiated the arbitration agreement disregards well-established precedent regarding the waiver of a contractual right to arbitration.

2. Waiver
A. Prejudice
Arbitration of disputes is strongly favored under both federal and Texas law. Accordingly, a strong presumption exists against the waiver of a contractual right to arbitration. EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 89 (Tex.1996); see also Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 898-99 (Tex.1995) (citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42, 74 L.Ed.2d 765 (1983)); Moore v. Morris, 931 S.W.2d 726, 728 (Tex.App.Austin 1996, orig. proceeding). A party does not waive its right to arbitration simply by invoking the judicial process. Pepe Int'l Dev. Co. v. Pub Brewing Co., 915 S.W.2d 925, 931 (Tex. App.Houston [1st Dist.] 1996, no writ) (citing Central Nat'l Ins. Co. v. Lerner, 856 S.W.2d 492, 494 (Tex.App.Houston [1st Dist.] 1993, orig. proceeding)). Additionally, delay in making a demand for arbitration does not constitute a waiver when there is no actual prejudice to the party opposing arbitration. Pepe Int'l Dev. Co., 915 S.W.2d at 931. In order to waive a contractual right to arbitration, the party seeking arbitration must have substantially invoked the judicial process to the opposing party's detriment. D. Wilson Constr. Co. v. McAllen Indep. Sch. Dist., 848 S.W.2d 226, 230 (Tex.App.Corpus Christi 1992, writ dism'd w.o.j.). The party opposing arbitration bears the burden of proof to show it has suffered prejudice. Id.; Hearthshire Braeswood Plaza Ltd. v. Bill Kelly Co., 849 S.W.2d 380, 386 (Tex. App.Houston [14th Dist.] 1993, writ denied); USX Corp. v. West, 759 S.W.2d 764, 767 (Tex.App.Houston [1st Dist.] 1988, orig. proceeding).
The waiver of a right to arbitrate must be intentional. Merrill Lynch, Pierce, Fenner & Smith v. Eddings, 838 S.W.2d 874, 879 (Tex.App.Waco 1992, writ denied). Implying waiver from a party's actions is appropriate only if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. EZ Pawn Corp., 934 S.W.2d at 89; Eddings, 838 S.W.2d at 879. When deciding whether the party seeking arbitration has substantially invoked the judicial process and prejudiced the party opposing arbitration, one of the factors courts consider is how much activity has taken place in the lawsuit. See D. Wilson Constr. Co., 848 S.W.2d at 230 (denial of motion to compel arbitration was improper where judicial process was barely invoked when motion filed); Eddings, 838 S.W.2d at 879 (denial of motion was improper where no showing by opposing party that it was prejudiced by proponent's delay in seeking arbitration, *498 even though proponent of arbitration initially invoked judicial process); Marble Slab Creamery, Inc. v. Wesic, Inc., 823 S.W.2d 436, 438 (Tex.App.Houston [14th Dist.] 1992, no writ) (denial of motion was proper where arbitration not mentioned until one month before trial after much discovery conducted and active pursuit of legal remedies by proponent of arbitration).
In the present case, plaintiffs sued and defendants answered and counterclaimed. Unlike the usual case, where a defendant seeks arbitration, here plaintiffs sought arbitration of the defendants' counterclaims, contending that the counterclaims were within the scope of the management agreements while arguing that their own causes of action were not within the scope of the agreements. Therefore, plaintiffs contend they were timely seeking arbitration of defendants' claims. Defendants, on the other hand, claim that plaintiffs waived arbitration by instituting the lawsuit in the first place. Defendants have never even attempted, however, to show that they were prejudiced by plaintiffs' filing suit.
Because defendants argued at the hearing that plaintiffs waived their right to arbitration, it was defendants' burden to show waiver, including that plaintiffs substantially invoked the judicial process and thereby prejudiced defendants. At the hearing before the trial court, the only argument defendants asserted to support waiver was that plaintiffs had filed suit before seeking arbitration. Defendants failed to file a written response to plaintiffs' motion to compel arbitration. Defendants neither presented evidence nor argued that they had been prejudiced by plaintiffs' actions. In reviewing the trial court's docket sheets submitted with the record in this cause, very little activity had occurred in the cause before plaintiffs sought arbitration. After plaintiffs answered defendants' counterclaims and filed their motion to compel arbitration, activity in the cause included only defendants' amended answer, plaintiffs' motion to quash, and a memorandum of law relating to a hearing on a temporary injunction. Thus, although plaintiffs invoked the judicial process, defendants failed to show they were prejudiced thereby.
Defendants failed to show that plaintiffs substantially invoked the judicial process or that defendants had been prejudiced thereby. Accordingly, defendants failed to overcome the strong presumptions in favor of arbitration and against waiver.
B. Scope of agreement
Moreover, even if defendants were not required to show prejudice in order to assert waiver, they have not demonstrated that the causes of action asserted by plaintiffs were under the management agreements so as to produce any waiver of their right to arbitration.
Plaintiffs' original petition asserted three causes of action, seeking: (1) injunctive relief prohibiting defendants from soliciting persons in Travis, Hays, or Williamson Counties in violation of the noncompetition provision; (2) damages for breach of fiduciary duty, and (3) damages for tortious interference with contracts and business relationships. When a court decides whether to grant or deny a motion to compel arbitration, it must determine whether the parties agreed to arbitrate and, if so, the scope of their agreement. Merrill Lynch, Pierce, Fenner & Smith v. Eddings, 838 S.W.2d 874, 878 (Tex.App. Waco 1992, writ denied). It is undisputed here that the counterclaims asserted by defendants arose under the management agreements. Thus, plaintiffs were entitled to have those claims arbitrated unless they had waived their right to arbitration. As noted above, the only ground on which defendants assert waiver is that the causes of action plaintiffs alleged in their lawsuit also arose under the management agreements. At issue, therefore, is whether any of the three claims asserted by plaintiffs were within the scope of the agreements.[2]
*499 (i) Injunctive Relief
By paragraphs 17 through 20 of their petition, plaintiffs requested injunctive relief. By these portions of the petition, plaintiffs complained that defendants caused them irreparable harm by (1) having the telephone company disconnect service to the medical centers, and (2) unfairly competing against the medical centers. Plaintiffs sought to have defendants restrained from such conduct. The parties agree that the terms of the management agreements specifically excluded requests for injunctive relief from the reach of the arbitration clause. Accordingly, plaintiffs' cause of action for injunctive relief was not inconsistent with the arbitration clause and could not give rise to a waiver of plaintiffs' right to arbitration.
(ii) Breach of Fiduciary Duty
By paragraph 16 of their petition, plaintiffs alleged that defendant Cates breached a fiduciary duty:
SECOND CAUSE OF ACTION
BREACH OF FIDUCIARY DUTY
16. Defendant Cates' conduct prior to execution of the Management Agreements constitutes breach of fiduciary duty in that Cates failed to exercise reasonable care and diligence in to [sic] the medical centers in the performance of his duties, he breached his duty to obey, he breached his duty to give information, and he breached his duty of loyalty.
In reading the allegation, the initial clause provides the foundation for the claim: "Cates' conduct prior to execution of the Management Agreements." (Emphasis added.) In an earlier paragraph containing allegations of factual background, the petition asserts that Cates performed several tasks for plaintiffs before the management agreements were executed. The only reasonable construction of plaintiffs' breach-of-fiduciary-duty claim is that it alleged a breach of duty before the parties executed the agreements. Because the cause of action alleged by paragraph 16 relates to a dispute that did not occur within the scope of the agreements and consequently is not subject to the arbitration clauses of the agreements, it could not give rise to a waiver of plaintiffs' right to arbitration.
(iii) Tortious Interference with Contracts and Business Relationships
By paragraph 15, plaintiffs' petition asserted that defendants tortiously interfered with plaintiffs' contractual and business relationships:
FIRST CAUSE OF ACTION
TORTIOUS INTERFERENCE WITH CONTRACTS AND BUSINESS RELATIONSHIPS
15. The Defendants' conduct constitutes wrongful or malicious interference with the Plaintiffs' performance or the formation of the contracts or the right to pursue a lawful business calling, trade, or occupation for which damages may be recovered.
To prove tortious interference with a contract, a plaintiff must prove that a defendant willfully and intentionally interfered with a contract that proximately caused the plaintiff actual damages. Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 939 (Tex.1991); Juliette Fowler Homes, Inc. v. Welch Assocs., Inc., 793 S.W.2d 660, 664 (Tex.1990). To prove tortious interference with prospective contracts or business relationships, a plaintiff must prove that the defendant willfully and intentionally acted to prevent a contractual relationship that the plaintiff had a reasonable probability of realizing, which proximately caused the plaintiff actual damages. Exxon Corp. v. Allsup, 808 S.W.2d 648, 659 (Tex.App.Corpus Christi 1991, writ denied). The nature of a tortious interference claim is that a third party interfered with the plaintiff's business relationships. A party to a contract generally cannot tortiously interfere with its own contract. Hussong v. Schwan's Sales Enters., Inc., 896 S.W.2d 320, 326 (Tex.App.Houston [1st Dist.] 1995, no writ) (citing Schoellkopf v. Pledger, 778 S.W.2d 897, 902 (Tex.App.Dallas 1989, writ denied)). Liability for tortious interference is usually founded only upon the acts of an interfering third party. Id.
In the present case, the contracts and business relationships alleged were those between plaintiffs and their unidentified patientsexisting and prospectiveat the *500 medical centers. The majority holds that, by their tortious interference cause of action, plaintiffs were actually alleging a violation of the noncompetition provision of the management agreements, i.e., a mere breach of contract. However, the relevant factual allegations contained in plaintiffs' petition do not support this construction of plaintiffs' claim. By paragraph 11 of their petition, plaintiffs alleged:
After the management agreements were terminated, on information and belief, the medical centers became aware that Cates had continued to operate CD Testing during the term of the Management Agreements in direct competition with the medical centers and that after the contract was terminated, Cates actively recruited business from the clients of the medical centers and has represented to the medical centers' clients that the medical centers have or are about to go out of business.
(Emphasis added.) Thus, the allegations of paragraph 11 refer to improper solicitations and representations by CD Testing to the clinics' patients after the management agreements were terminated. Because CD Testing was not a party to the management agreements, an allegation that CD Testing was unfairly or improperly soliciting plaintiffs' clients or making misrepresentations to them could not be a claim under those agreements. The only other factual allegation that appears to relate to plaintiffs' claim for tortious interference was paragraph 13 of their petition, by which plaintiffs alleged that Cates had wrongfully disconnected the clinics' telephone service after the agreements were terminated. Again, this allegation has nothing to do with a violation of the noncompetition clause of the management agreements. Accordingly, plaintiffs' tortious interference claim did not arise under the management agreements and could not give rise to a waiver of plaintiffs' right to arbitration.
Alternatively, reading the tortious-interference cause of action and the related factual allegations as broadly as possible, the scope of that claim is at best ambiguous. For example, even if the factual allegations in paragraphs 11 and 13or other portions of the petitionwere intended to refer to Eagle Medical instead of CD Testing, such allegations could logically relate to plaintiffs' request for injunctive relief rather than one of their tort claims for damages. And, as stated earlier, the management agreements expressly excluded any claim for injunctive relief from the arbitration provision. Surely the strong presumption against waiver of the right to arbitrate cannot be overcome by an ambiguous allegation.
Accordingly, none of plaintiffs' three causes of action arose under the management agreements so as to produce waiver of plaintiffs' right to arbitration.

3. Threat of Inconsistent Results
The majority also holds that reversing the district court's order and compelling Eagle Medical's and Cates's counterclaims to arbitration would lead to the possibility of contradictory determinations. The majority argues the trial court and arbitrators could potentially construe provisions of the Management Agreements differently. As discussed above, however, plaintiffs' claim for tortious interference has nothing to do with the noncompetition clause of the Management Agreements, and plaintiffs' breach of fiduciary duty cause of action relates to events that took place "prior to the execution of the Management Agreements." Thus, there would be no need for the trial court to "interpret" the Management Agreements. Therefore, plaintiffs' and defendants' claims are not so factually intertwined as to risk multiple determinations of the same matter.[3]
Moreover, even if compelling defendants' counterclaims to arbitration could lead to the possibility of inconsistent determinations, the proper approach is not to annul plaintiffs' contractual right to arbitration and mandate that all disputes be resolved in court. Such a holding would be directly contrary to Texas's public policy strongly favoring arbitration of disputes. See Cantella & Co. v. Goodwin, *501 924 S.W.2d 943, 944 (Tex.1996); Marshall, 909 S.W.2d at 899; Brazoria County v. Knutson, 142 Tex. 172, 176 S.W.2d 740, 743-44 (1943). Potentially inconsistent results is not a sufficient ground to nullify this policy. If in fact plaintiffs' and defendants' causes of action are so interwoven that they cannot be maintained without reference to the management agreements, the proper result is not to invalidate a party's right to arbitration, but rather might be to compel all claims to arbitration. See, e.g., Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 271 (Tex.1992); Emerald Texas, Inc. v. Peel, 920 S.W.2d 398, 404 (Tex.App.Houston [1st Dist.] 1996, no writ); Howell Crude Oil Co. v. Tana Oil & Gas Corp., 860 S.W.2d 634, 639 (Tex.App. Corpus Christi 1993, no writ); Valero Energy Corp. v. Wagner & Brown, 777 S.W.2d 564, 567 (Tex.App.El Paso 1989, writ denied). Courts of appeals have severed cases involving both arbitrable and nonarbitrable claims by sending some causes of action to arbitration and others to trial. See, e.g., Decision Control Systems, Inc. v. Personnel Cost Control, Inc., 787 S.W.2d 98, 100-01 (Tex.App.Dallas 1990, no writ). No court, however, confronted with both arbitrable and nonarbitrable claims, has abrogated a party's right to arbitration and ordered that arbitrable causes of action be tried in court with other nonarbitrable claims.
Although Texas courts have had little opportunity to decide how to proceed when parties assert both arbitrable and nonarbitrable claims, federal courts have addressed the issue on a number of occasions. The United States Supreme Court has examined this issue in regard to the Federal Arbitration Act ("FAA").[4]See 9 U.S.C.A. §§ 1-16 (West 1970 & Supp.1996). In Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), Byrd invested funds with Dean Witter and signed a customer agreement providing for arbitration of disputes between the parties arising under the agreement. Byrd later sued Dean Witter alleging violations of the Securities Exchange Act of 1934 and various state law provisions. Id. at 214, 105 S.Ct. at 1239. Dean Witter moved to sever and compel the state law claims to arbitration. Id. at 215, 105 S.Ct. at 1239-40. The district court and court of appeals denied Dean Witter's motion, holding that when arbitrable and nonarbitrable claims arise out of the same transaction, and are sufficiently intertwined, a court may deny arbitration as to the arbitrable claims and try all the claims together in court. Id. at 216-17, 105 S.Ct. at 1240-41. The Supreme Court rejected the so called "doctrine of intertwining" and reversed the court of appeals. While acknowledging the lower court's concern for avoiding bifurcated proceedings and potentially redundant efforts to litigate the same factual questions twice, the Supreme Court held that the "[FAA] requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." Id. at 217, 105 S.Ct. at 1241 (emphasis added); see also Girard v. Drexel Burnham Lambert, Inc., 805 F.2d 607, 611 (5th Cir.1986). The court noted that even if the result is "piecemeal litigation," the pre-eminent concern in passing the FAA was to enforce private agreements into which parties had entered. Byrd, 470 U.S. at 221, 105 S.Ct. at 1242-43; see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625-26, 105 S.Ct. 3346, 3353-54, 87 L.Ed.2d 444 (1985); NPS Communications, Inc. v. Continental Group, Inc., 760 F.2d 463, 465 (2d Cir.1985). "The heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course." Byrd, 470 U.S. at 225, 105 S.Ct. at 1245 (White, J., concurring).
Many other federal courts have recognized the merit in allowing arbitration and litigation to proceed simultaneously. See, e.g., Chang v. Lin, 824 F.2d 219, 223 (2d Cir. 1987); Girard v. Drexel Burnham Lambert, Inc., 805 F.2d 607, 611 (5th Cir.1986); Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir.1976); Roueche v. Merrill Lynch Pierce Fenner & Smith, Inc., *502 554 F.Supp. 338, 340 (D.Haw.1983); Horne v. New England Patriots Football Club, Inc., 489 F.Supp. 465, 470 (D.Mass.1980).
The policy of enforcing private arbitration agreements was likewise a primary concern of the legislature in enacting the TGAA. See Tex. Civ. Prac. & Rem.Code Ann. § 171.021 (West 1997). The majority, however, ignores this policy and returns to the rejected "intertwining doctrine," effectively allowing parties to avoid arbitration simply by asserting nonarbitrable claims or by adding parties who are not subject to the arbitration agreement. See Prudential-Bache Sec., Inc. v. Garza, 848 S.W.2d 803, 807 (Tex.App.Corpus Christi 1993, orig. proceeding) (arbitration agreement must be enforced despite presence of other parties); see also Tenneco Resins, Inc. v. Davy Int'l, AG, 770 F.2d 416 (5th Cir.1985).

CONCLUSION
I would hold that plaintiffs' causes of action for injunctive relief and tort damages were not subject to the arbitration clauses in the management agreements, and that, by asserting those claims, plaintiffs did not waive their right to seek arbitration of defendants' counterclaims. Accordingly, I would sustain plaintiffs' points of error one through four, reverse the trial court's order, and remand the cause to the trial court.
NOTES
[1] The plaintiffs, appellants here, are Vireo, P.L.L.C., and Chaetura, P.L.L.C., each a professional limited-liability company organized and existing under the laws of the State of Texas to practice medicine, together with William Franklin, M.D., and Don Connell, M.D.
[2] In the present cause, the parties applied for injunctive relief each against the other. No controversy in that respect is presented in the appeal.
[3] We overrule point of error three because it is based upon an erroneous assumption. No evidence was received at the hearing on plaintiffs' motion to compel arbitration.
[4] Defendants moved that we dismiss the appeal for want of subject-matter jurisdiction because of the interlocutory nature of the trial-court order. Section 171.017 of the Arbitration Act provides that "[a]n appeal may be taken from ... an order denying an application to compel arbitration made under Section 171.002(a)," and that such appeals "shall be taken in the manner and to the same extent as from orders and judgments in a civil action." Tex. Civ. Prac. & Rem.Code Ann. § 171.017(a)(1), (b) (West Supp.1997). Defendants reason that this statute does not specifically authorize an interlocutory appeal but only an appeal after final judgment as in the case of most interlocutory orders. We disagree. See Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 271-72 (Tex.1992). We overrule defendants' motion to dismiss the appeal.
[5] Plaintiffs apparently contend in their appellate briefs that they were entitled to relief on their motion to compel arbitration of defendants' counterclaims, as a matter of law, because defendants did not file a response to the plaintiffs' motion. We reject the argument. Defendants' failure to file a response did not entitle plaintiffs to relief by default; it remained plaintiffs' burden to persuade the trial court that a proper construction and application of Paragraph Nine to the pleadings required the requested relief as a matter of law. Cf. City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.1979) (summary judgment may not be granted by default for want of response by nonmovant, but only when summary judgment record shows right to judgment as a matter of law).
[6] In ordinary usage, the word "concern" means "a connecting relation" in the present context. Webster's Third International Dictionary 470 (Philip B. Gove ed., 1986). This appears less restrictive than the term "arise under" sometimes found in the arbitration provision of contracts.
[7] The annotation does not mention "prejudice" to either party as a factor to be considered in determining the issue of waiver in the circumstances indicated. Prejudice is a relevant factor, however, when the plaintiff claims the defendant has waived his right to arbitrate by his participation in the actionunless the plaintiff is prejudiced thereby, he cannot avoid arbitration merely on the ground of the defendant's participation in the judicial proceeding. See, e.g., Prudential Sec., Inc. v. Marshall, 909 S.W.2d 896, 898-99 (Tex.1995); see also Joel E. Smith, Annotation, Defendant's Participation In Action As Waiver of Right to Arbitration of Dispute Involved Therein, 98 A.L.R.3d 767 (1980).

When a plaintiff sues in violation of the arbitration agreement, however, the resulting issue pertains to the right of election thereby created in the defendant by operation of law. Will the defendant join issue in court or will he insist upon his contract right of arbitration? If he is denied the right of election, the prejudice is self-evident. It is particularly apparent if the defendant should be required to arbitrate his claims against the plaintiff but defend in court the plaintiff's claims against himself, when each party's claims against the other come within the scope of the arbitration agreement and arise from the same general dispute. It is unreasonable to suppose that the law validates such a confusion of forums and proceedings, the possibility of conflicting determinations, and the resulting prejudice.
[8] The "Noncompetition" provision in the Management Agreements stated as follows:

Eagle, its officers, directors and shareholders covenant and agree that during the term of this Agreement and for a period of twelve (12) months after this Agreement is terminated for any reason, Eagle, its officers, directors, and shareholders shall not provide the same or similar services described in this Agreement to any other person, individual or otherwise, who [plaintiffs] reasonably believes to be in competition with [plaintiffs] in Travis, Williamson and/or Hays County, Texas. Eagle agrees to provide [plaintiffs] with ten (10) days prior written notice of Eagle's intent to enter into a management services agreement with any third parties.
[1] If this cause were governed by the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16 (West 1970 & Supp.1996), or by common law, this Court would be without jurisdiction over this appeal. See Tex. Civ. Prac. & Rem.Code Ann. § 171.017(a)(1) (West 1997); Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 272 (Tex.1992).
[2] Because CD Testing was not a party to the management agreements, the causes of action alleged by and against it are not subject to the arbitration clauses in the agreements. See Pepe Int'l Dev. v. Pub Brewing Co., 915 S.W.2d 925, 931 (Tex.App.Houston [1st Dist.] 1996, no writ); Prudential-Bache Sec., Inc. v. Garza, 848 S.W.2d 803, 807 (Tex.App.Corpus Christi 1993, orig. proceeding).
[3] Moreover, the threat of inconsistent results seems dubious in this case; counter-plaintiff CD Testing appears to lack standing to raise counterclaims for breach of agreements to which it was not a party.
[4] Because our state policy favoring arbitration mirrors the federal policy favoring arbitration, federal cases interpreting the FAA are persuasive in interpreting arbitration clauses governed by the TGAA.